# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Jaleel Kevin Stallings,

       Plaintiff,

v.

Andrew Bittell, acting in his individual capacity
as a Minneapolis Police Officer; Michael Osbeck,
Jr., acting in his individual capacity as a
Minneapolis Police Officer; Christopher
Cushenbery, acting in his individual capacity as a
Minneapolis Police Officer; Justin Stetson, acting
in his individual capacity as a Minneapolis Police
Officer; Kristopher Dauble, acting in his
individual capacity as a Minneapolis Police
Officer; Nathan Sundberg, acting in his individual
capacity as a Minneapolis Police Officer;
Matthew Severance, acting in his individual
capacity as a Minneapolis Police Officer;
Christopher Lokke, acting in his individual
capacity as a Minneapolis Police Officer; Ronald
Stenerson, acting in his individual capacity as a
Minneapolis Police Officer; James Jensen, acting
in his individual capacity as a Minneapolis Police
Officer; Michael Heyer, acting in his individual
capacity as a Minneapolis Police Officer; Johnny
Mercil, acting in his individual capacity as a
Minneapolis Police Officer; Bruce Folkens, acting
in his individual capacity as a Minneapolis Police
Officer; Robert Kroll, acting in his individual
capacity as a Minneapolis Police Officer; John
Does 1-5, acting in their individual capacities as
Minneapolis Police Officers; and the City of
Minneapolis,

       Defendants.

Case No.
**Complaint**

Jury Trial Demanded
Fed. R. Civ. P. 38(b)

---

For his Complaint, Plaintiff Jaleel Kevin Stallings ("Mr. Stallings") states and alleges as follows:

## INTRODUCTION

1.     On May 30, 2020, Minneapolis Police Department ("MPD") officers engaged in a pattern of violence and malice toward protesters and civilians following the murder of George Floyd ("Mr. Floyd"). Jaleel Stallings was one victim of that operation. While Mr. Stallings was in a parking lot, an unmarked van came past a building and immediately fired two shots at him. One shot hit Mr. Stallings in his chest. Fearing for his life, Mr. Stallings fired toward, but not directly at, the van while he went into cover. Once in cover, Mr. Stallings learned that the van contained police officers. He discarded his weapon and surrendered. Despite his surrender, officers beat him for approximately thirty seconds. Nearby officers watched and did nothing to stop the beating.

2.     After Mr. Stallings was arrested, officers provided false accounts of the incident and omitted important facts that supported Mr. Stallings' claim of self-defense. Officers falsely claimed that Mr. Stallings shot without provocation. Officers falsely claimed that Mr. Stallings resisted during arrest.

3.     Despite these false reports, video evidence showed that officers were ordered to attack civilians. Recordings showed that officers deliberately concealed their appearance so that they could "hunt" civilians by sneaking up and shooting them with 40mm rounds. Recordings showed that Mr. Stallings fully submitted to officers as they beat him during the arrest.

2

4.      The investigation following Mr. Stallings' arrest relied on false officer reports. The investigation failed to report favorable facts supporting Mr. Stallings' exercise of self-defense. The investigation failed to report that officers gave false and misleading statements that were contradicted by recordings of the incident. Only through Mr. Stallings' own investigative efforts was he acquitted of attempted murder and assault after a jury trial.

5.      Officers violated Mr. Stallings' Fourth Amendment rights by using excessive force during the encounter on May 30, 2020. Other officers failed to intervene and prevent or stop these violations.

6.      Officers violated Mr. Stallings' First Amendment rights by using force to intimidate and deter Mr. Stallings and others from assembling and protesting against police brutality and racism.

7.      Officers violated Mr. Stallings' Fourteenth Amendment Due Process rights by engaging in conduct that shocked the conscience. Officers engaged in a malicious pattern of force designed to injure and scare civilians. After the incident, investigating officers conducted a recklessly-flawed investigation that relied on false evidence and failed to document evidence of self-defense.

8.      Officers violated Mr. Stallings' Equal Protection Clause rights by targeting Black civilians with force and accusing Black civilians of engaging in felonious conduct without evidentiary support. Mr. Stallings was a Black man who was improperly targeted and attacked due to officers' racial bias.

9.      Other officers conspired to commit and conceal these constitutional violations. With the assistance of conspiring officers, these violations were allowed to occur without fear of accountability or adverse consequences for the involved officers.

10.     Supervising officers not only knew of these violations—they condoned and encouraged them. Recordings show supervisors ordering officers to prioritize and use force against their community. Supervisors showed deliberate indifference to the constitutional violations committed by their officers.

11.     These violations are part of a pattern of constitutional violations by the MPD. Customs causing constitutional violations were long-known by the MPD and the community at-large before this incident. In fact, it was this historical pattern of constitutional violations and lack of accountability or deterrence that led the community to protest with such intensity after the murder of George Floyd. Despite community outrage, the MPD failed to provide sufficient training or supervision to prevent further violations from occurring. Recordings from May 30, 2020 show that violations were freely and widely committed without meaningful attempts to limit, deter, or stop them.

12.     Mr. Stallings seeks redress for the claims presented herein. Mr. Stallings seeks compensation for the damages caused by the constitutional violations described. Mr. Stallings seeks punitive damages to prevent further violations from occurring. Mr. Stallings seeks other appropriate relief as proceedings permit.

## PARTIES AND VENUE

13.     Plaintiff Jaleel Kevin Stallings is a citizen of Minnesota. Mr. Stallings is a military veteran who had a valid permit to carry a weapon on May 30, 2020. Mr. Stallings is a Black man who sought to participate in protests following Mr. Floyd's death.

14.     Defendant Andrew Bittell ("Sgt. Bittell") is, upon information and belief, a citizen of Minnesota. Sgt. Bittell served as an officer in the MPD on May 30, 2020. Sgt. Bittell supervised Unit 1281 on May 30, 2020. Sgt. Bittell acted under color of state law at all material times. He is sued in his individual capacity.

15.     Defendant Michael Osbeck, Jr. ("Officer Osbeck") is, upon information and belief, a citizen of Minnesota. Officer Osbeck served as an officer in the MPD on May 30, 2020. Officer Osbeck acted under color of state law at all material times. He is sued in his individual capacity.

16.     Defendant Christopher Cushenbery ("Officer Cushenbery") is, upon information and belief, a citizen of Minnesota. Officer Cushenbery served as an officer in the MPD on May 30, 2020. Officer Cushenbery acted under color of state law at all material times. He is sued in his individual capacity.

17.     Defendant Justin Stetson ("Officer Stetson") is, upon information and belief, a citizen of Minnesota. Officer Stetson served as an officer in the MPD on May 30, 2020. Officer Stetson acted under color of state law at all material times. He is sued in his individual capacity.

18.     Defendant Kristopher Dauble ("Officer Dauble") is, upon information and belief, a citizen of Minnesota. Officer Dauble served as an officer in the MPD on May 30,

2020. Officer Dauble acted under color of state law at all material times. He is sued in his individual capacity.

19.    Defendant Nathan Sundberg ("Officer Sundberg") is, upon information and belief, a citizen of Minnesota. Officer Sundberg served as an officer in the MPD on May 30, 2020. Officer Sundberg acted under color of state law at all material times. He is sued in his individual capacity.

20.    Defendant Matthew Severance ("Sgt. Severance") is, upon information and belief, a citizen of Minnesota. Sgt. Severance served as an officer in the MPD on May 30, 2020. Sgt. Severance acted as a supervisor on May 30, 2020. Sgt. Severance acted under color of state law at all material times. He is sued in his individual capacity.

21.    Defendant Christopher Lokke ("Sgt. Lokke") is, upon information and belief, a citizen of Minnesota. Sgt. Lokke served as an officer in the MPD on May 30, 2020. Sgt. Lokke acted as a supervisor during the relevant time period. Sgt. Lokke acted under color of state law at all material times. He is sued in his individual capacity.

22.    Defendant Ronald Stenerson ("Sgt. Stenerson") is, upon information and belief, a citizen of Minnesota. Sgt. Stenerson served as an officer in the MPD on May 30, 2020. Sgt. Stenerson acted under color of state law at all material times. He is sued in his individual capacity.

23.    Defendant James Jensen ("Sgt. Jensen") is, upon information and belief, a citizen of Minnesota. Sgt. Jensen served as an officer in the MPD on May 30, 2020. Sgt. Jensen acted as a supervisor during the relevant time period. Sgt. Jensen acted under color of state law at all material times. He is sued in his individual capacity.

24.    Defendant Michael Heyer ("Sgt. Heyer") is, upon information and belief, a citizen of Minnesota. Sgt. Heyer served as an officer in the MPD on May 30, 2020. Sgt. Heyer acted as a supervisor during the relevant time period. Sgt. Heyer acted under color of state law at all material times. He is sued in his individual capacity.

25.    Defendant Johnny Mercil ("Lt. Mercil") is, upon information and belief, a citizen of Minnesota. Lt. Mercil served as an officer in the MPD on May 30, 2020. Lt. Mercil acted as a supervisor on May 30, 2020. Lt. Mercil acted under color of state law at all material times. He is sued in his individual capacity.

26.    Defendant Bruce Folkens ("Commander Folkens") is, upon information and belief, a citizen of Minnesota. Commander Folkens served as an officer in the MPD on May 30, 2020. Commander Folkens acted as a supervisor at all relevant times. Commander Folkens acted under color of state law at all material times. He is sued in his individual capacity.

27.    Defendant Robert Kroll ("Lt. Kroll") is, upon information and belief, a citizen of Minnesota. Lt. Kroll served as an officer in the MPD on May 30, 2020. Lt. Kroll acted under color of state law at all material times. He is sued in his individual capacity.

28.    Defendants John Does 1-5 (the "Non-intervening Defendants") are, upon information and belief, unidentified individuals who were employed as officers in the MPD on May 30, 2020 and acted under color of state law at all material times. They are sued in their individual capacities.

29.    Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota and is a citizen of Minnesota. The MPD is an agency of the City of Minneapolis.

## JURISDICTION

30.     Mr. Stallings brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). These statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

31.     The events giving rise to this action occurred in Minneapolis, Minnesota. Venue is proper under 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### The George Floyd Protests

32.     On May 25, 2020, Mr. Floyd was murdered during an arrest by MPD officer Derek Chauvin.

33.     After Mr. Floyd's death, widespread and substantial protests occurred throughout the country. Many of these protests occurred in Minneapolis and, specifically, at Cup Foods in Minneapolis, the location where Mr. Floyd died.

34.     The protests opposed racism and excessive use of force by the MPD and other law enforcement agencies.

35.     During the protests, some civilians caused property damage and violence. Subsequent investigations and proceedings have revealed that some damage and violence

were committed by white supremacists appearing as protesters in order to incite racial violence.[1]

36.     One such civilian was recorded causing property damage while dressed in black with a gas mask and umbrella. Some people thought that the person might be a police officer, but the St. Paul Police Department responded on Twitter that the person was not an officer.[2] It was later claimed that officers identified that person as a white supremacist trying to incite violence during the protests.[3]

37.     On May 30, 2020, Governor Walz warned that white supremacists and groups from other areas were causing violence and damage at the protests.[4] The warning was widely reported by national media.

**Officers Attack Civilians for Assembling and Protesting**

38.     On May 30, 2020, Sgt. Bittell and Officers Osbeck, Cushenbery, Stetson, Dauble, and Sundberg operated as Unit 1281. Unit 1281 used less-lethal weaponry in

---

[1] Matt Sepic, *Texas man, 24, admits shooting at Minneapolis police station during riot*, MPR NEWS, Sept. 30, 2021, https://www.mprnews.org/story/2021/09/30/texas-man-24-admits-shooting-at-minneapolis-police-station-during-riot.

[2] Sharon Yoo, *Deciphering fact from fiction during times of high emotion*, KARE 11, May 28, 2020, https://www.kare11.com/article/news/deciphering-fact-and-fiction-george-floyd/89-034b6045-4166-4517-a9ca-e1730faa7d14.

[3] Libor Jany, *Minneapolis police say 'Umbrella Man' was a white supremacist trying to incite George Floyd rioting*, STARTRIBUNE, July 28, 2020, https://www.startribune.com/police-umbrella-man-was-a-white-supremacist-trying-to-incite-floyd-rioting/571932272/.

[4] Shane Harris, *Officials blame outsiders for violence in Minnesota but contradict one another on who is responsible*, THE WASHINGTON POST, May 30, 2020, https://www.washingtonpost.com/national-security/officials-blame-outsiders-for-violence-in-minnesota-but-contradict-each-other-on-who-is-responsible/2020/05/30/d722e9d6-a2b1-11ea-b5c9-570a91917d8d_story.html.

support of other units. Unit 1281 operated in a white, unmarked van while dressed in black tactical gear and gas masks. Although some officers had a "Police" patch on their vests, the patch could be obscured by munitions, equipment, and weapons carried and used by officers.

39.     Unit 1281 officers used black-barreled 40mm launchers on May 30, 2020. Unit 1281 officers used a variety of 40mm rounds toward civilians that evening.

40.     40mm launchers cause two effects: (1) scare targets and (2) hurt targets.

41.     On May 30, 2020 Sgt. Bittell commanded and supervised Unit 1281.

42.     Officer Osbeck drove the unit's van.

43.     Officers Cushenbery, Stetson, and Dauble carried 40mm launchers and shot rounds at civilians throughout the evening.

44.      Throughout May 30, 2020, Unit 1281 officers fired many 40mm rounds toward civilians. Officers fired rounds at civilians who were not posing a safety threat. Officers fired toward civilians who were only violating curfew, a non-violent misdemeanor offense. Officers used force without first using less- or non-forceful alternatives. Officers used force without warning or announcement.

45.     Officers' use of force in this manner violated MPD policies, as well as applicable law and constitutional rights.

46.     Approximately one hour before encountering Mr. Stallings, Unit 1281 deployed to the vicinity of Lake St. and Pillsbury Ave. in Minneapolis where a large group of protesters were present.

47.     The protesters had gathered to oppose police violence and racism that led to the death of Mr. Floyd. Protesters yelled slogans and chanted.

48.     At that location, Lt. Mercil acted as supervisor of the assembled officers, including Unit 1281.

49.     Prior to and on May 30, 2020, Lt. Mercil was in charge of use-of-force training for MPD officers.

50.     At that location, Lt. Mercil saw officers using improper force toward protesters and other civilians.

51.     Lt. Mercil suggested that he had seen additional prior uses of improper force by officers toward journalists and other civilians.

52.     Knowing that officers had used improper force and were apt to use improper force toward civilians, Lt. Mercil ordered officers to clear protesters.

53.     Under Lt. Mercil's supervision and at his command, officers used 40mm rounds and physical force against civilians that violated MPD policies and constitutional rights.

54.     Neither Lt. Mercil nor other supervising officers at that location made any effort to stop, deter, or prevent further improper force.

55.     After protesters moved away, Sgt. Bittell instructed officers to "wait" and "draw [the protesters] in." He wanted protesters to come closer to the line of officers so that officers could shoot the protesters with 40mm rounds. However, protesters did not draw closer and officers did not shoot at that time.

56.     Throughout the evening, Sgt. Bittell directed his team to wait for civilians to come closer to their position so that officers could shoot them with 40mm rounds. Officers used verbal commands to disperse the civilians only after first using force.

57.     Officers repeatedly issued commands and used ambush tactics to draw unsuspecting civilians into range to then use force without warning or announcement.

58.     Near Lake St. and Pillsbury Ave., protesters began to leave the area. Unit 1281 officers ran toward protesters who did not retreat quickly.

59.     Officer Stetson struck a protester in the back of the head with his 40mm launcher. The protester was standing with arms raised and his back to Officer Stetson at the time.

60.     While clearing protesters, officers used many 40mm rounds toward civilians, even toward civilians at a significant distance from officers.

61.     Officer Stetson fired a 40mm round and struck a distant civilian. Officers Stetson yelled "gotcha" at the civilian that he had struck. Other officers laughed and congratulated Officer Stetson. Officer Dauble gave Officer Stetson a fist bump.

62.     While the protesters were being cleared, Officer Osbeck spoke with Lt. Mercil.

63.     Lt. Mercil mocked journalists who had been covering the protests. Lt. Mercil spoke positively about using force and suggested that it was time to put people in jail instead of scattering them. Lt. Mercil expressed encouragement and approval to Officer Osbeck regarding improper use of force toward journalists and others.

64.     Lt. Mercil discussed a desire to prove the mayor wrong about the warning that white supremacists from other states were causing violence and damage.

65.     Lt. Mercil proposed that the current group of protesters were "predominantly white" because there was "not looting and fires."

66.     Officer Osbeck said that he agreed with Lt. Mercil and noted that the people he had interacted with were white and from Minneapolis.

67.     Lt. Mercil encouraged and condoned unnecessary force toward civilians to Officer Osbeck and others. Lt. Mercil suggested to Officer Osbeck that non-white persons should be viewed with suspicion of causing fires and looting based upon their skin color.

68.     That suspicion encouraged targeting and use of force toward non-white persons.

69.     On May 30, 2020, Unit 1281 and other officers directed their force toward Black civilians and persons protesting in support.

70.     Officers falsely and inaccurately described Black persons as looters or rioters on May 30, 2020 and during the surrounding time period.

71.     Officers described Mr. Stallings and his group as suspected looters and rioters despite the fact that they were only observed violating curfew.

72.     Officers did not actually observe Mr. Stallings or his group looting or rioting.

73.     Video recordings show that Mr. Stallings did not, in fact, engage in looting or rioting before being shot at by officers.

**Unit 1281 is directed to Shoot Civilians on Lake St.**

74.     At approximately 10:40 p.m., Unit 1281 deployed to Hiawatha Ave. and Lake St. Unit 1281 joined other officers who were using marked squad cars.

75.     Another officer told Sgt. Bittell that they should be more proactive finding civilians instead of "chasing our tail." Sgt. Bittell agreed and said that his team would be the "head of the snake."

76.     Sgt. Severance acted as a supervisor at this location. At Lake St. and Hiawatha Ave., Sgt. Severance was able to observe officers using improper force toward civilians in the area. Sgt. Severance described that use of force toward civilians as "f***[ing] them up."

77.     Sgt. Severance directed Sgt. Bittell and other assembled officers to drive down Lake St. and find groups of people. He said, "you see a f***ing group, call it out, ok great, f*** 'em up. Gas 'em, f*** 'em up." Sgt. Bittell chuckled and responded, "So we can start there."

78.     Sgt. Severance's command encouraged officers to use improper force toward civilians on Lake St.

79.     Sgt. Bittell met Unit 1281 officers by their van. Sgt. Bittell told his team about their mission: "We're rolling down Lake St. The first f***ers we see, we're just handling them with 40[mm rounds]." Sgt. Bittell asked his team if that was a "good copy." Unit 1281 officers responded with laughter and enthusiasm.

80.     Throughout the evening of May 30, 2020, officers used 40mm rounds to inflict pain and intimidate civilians who were demonstrating against improper police practices.

81.     Officers in Unit 1281 admitted that they enjoyed using 40mm rounds toward civilians.

82.     Officers showed happiness when discussing force used against civilians during the protests.

83.     A Unit 1281 officer joked about "hunting" civilians that evening.

84.     Officers used 40mm rounds against civilians for the officers' enjoyment.

85.     Earlier in the evening, Sgt. Bittell asked his team how they were doing on "long range" ammunition. An officer smiled, laughed, and responded that it was "very effective."

86.     Another officer near Sgt. Bittell saw an officer's broken baton and said "that's outstanding," showing joy at the force that would have caused the baton to break.

87.     Before encountering Mr. Stallings, Sgt. Bittell discussed tactics with another officer. The officer complained that civilians were "p*****s" and explained that "[officers] get within thirty feet of [civilians] and they run." Sgt. Bittell agreed and responded, "Exactly, you got to hit them with the 40[mm rounds]."

88.     Before heading down Lake St., Unit 1281 officers loaded into the unmarked van.  Sgt. Bittell sat in the front passenger seat. The driver, Officer Osbeck, asked Sgt. Bittell, "What are we doing with these people on Lake St.?" Sgt. Bittell responded,

"Shooting them with 40[mm rounds]." After Sgt. Bittell's comment, an officer in the van laughed.

89.     Unit 1281 led a caravan of marked squads. Unit 1281 drove without emergency lights activated on the unmarked van.

90.     Unit 1281's van was used by officers for operations in which officers did not want the community to know about their presence.

91.     Without emergency lights active, the van looked like a civilian van. There was no light bar or markings indicating that it was a law enforcement vehicle.

92.     Sgt. Bittell directed other squad cars to have no lights or sirens. He said the operation was "like a slow jog in the park finding people."

93.     While driving, a Unit 1281 officer asked Sgt. Bittell to "get the [marked squad cars] to slow down and stay behind us so we can use the [40mm launchers]." Sgt. Bittell told other cars to slow down and stay behind the van.

94.     At 17th Ave. and Lake St., Unit 1281 came upon a large group of people gathered at a gas station. Sgt. Bittell told his officers to shoot the people outside the gas station with 40mm rounds. Officers in the back of the van fired many 40mm rounds toward the civilians as the civilians fled.

95.     Officers dismounted and pointed 40mm launchers toward civilians at the gas station. One person at the gas station was a reporter for VICE News. He informed officers that he was press. A Unit 1281 officer kept his 40mm launcher raised toward the reporter and ordered him onto the ground. The officer pushed the reporter from a kneeling position onto the ground. Another officer used chemical irritant spray on the reporter.

96.     Sgt. Bittell learned that the people at the gas station were the owner and the owner's family and friends who were protecting the station from looters.

97.     Sgt. Bittell and other supervisors observed improper use of force at the gas station. Sgt. Bittell and other supervisors took no corrective action to prevent further use of improper force.

98.     Sgt. Bittell did not care that his team improperly used force toward persons protecting a business.

99.     Sgt. Bittell did not care if Unit 1281 continued to use improper force toward persons on Lake St.

### Unit 1281 encounters Mr. Stallings

100.    Unit 1281 officers loaded back into the van and continued their westbound patrol down Lake St.

101.    During the drive, an officer said that the focus was on "sidewalks" and "runners."

102.    At this time, Lake St. was calm and quiet. There were not large groups present. No one was actively breaking into businesses, starting fires, or causing civil disruptions.

103.    The only criminal activity observed by officers on Lake St. was curfew violation. Officers did not observe looting, rioting, arson, or violent behavior.

104.    Officers knew that they were to use 40mm rounds only toward persons committing property damage, looting, or arson, posing a safety threat, or as otherwise

necessary. Officers knew that violation of curfew, by itself, did not warrant shots with 40mm launchers.

105.   Lake St. was calm until officers shot at civilians without warning. When shot at, civilians became alarmed and ran to avoid being shot at further.

106.   At 15th Ave. and Lake St., Sgt. Bittell observed a group of people standing on the street corner. The group was not seen committing any criminal activity other than curfew violation. Sgt. Bittell called out the group to the team so that they could target the civilians.

107.   As the van approached, the civilians were walking north on 15th Ave. with their backs to the unmarked van. Without warning or announcement, Officers Dauble and Cushenbery fired 40mm rounds toward the civilians, causing nearby civilians to become alarmed. A Unit 1281 officer shouted, "Go home!" toward the civilians on the street.

108.   Unit 1281's shots caused a person in front of the van to run west on Lake St., past the Parking Lot where Mr. Stallings was with his group.

109.   Officers observed that their shots caused people in the area to start running.

110.   Officers had previously observed 40mm rounds causing civilians to become alarmed and flee from an area.

111.   While approaching 14th Ave. on Lake St., Officer Osbeck called out Mr. Stallings' group. Officer Osbeck said that a "group to the parking in the north" was "running."

112.   Officer Osbeck called out the group so that they could be targeted and shot with 40mm rounds.

113.   Sgt. Bittell saw Mr. Stallings' group and directed his team to shoot the group with 40mm rounds.

114.   Sgt. Bittell gave his command loudly enough that other officers in the van could hear him.

115.   Officer Cushenbery shot a 40mm round toward Mr. Stallings after Sgt. Bittell's command.

116.   Before the shot, the only criminal activity that Unit 1281 officers observed Mr. Stallings committing was curfew violation, which is a non-violent misdemeanor offense.

117.   After being shot at by Officer Cushenbery, Mr. Stallings slightly crouched as a defensive maneuver.

118.   Officer Stetson observed that Officer Cushenbery had shot at Mr. Stallings and that Mr. Stallings' crouching motion was a response to being shot at.

119.   Quickly after Officer Cushenbery's shot, Officer Stetson fired a 40mm round at Mr. Stallings.

120.   Officers Cushenbery and Stetson directed shots toward center mass, the middle of Mr. Stallings' chest area.

121.   Officers did not see Mr. Stallings carrying a firearm before officers shot two 40mm rounds at Mr. Stallings.

122.   During the approach, Officer Dauble had his 40mm launcher raised and was targeting Mr. Stallings.

123.   Officer Dauble was unable to fire immediately because his shot was disrupted by shots fired by Mr. Stallings in response to the first two 40mm rounds fired at him.

124.   Officer Dauble recovered and shot a 40mm round toward Mr. Stallings' truck.

125.   Officers shot 40mm marking rounds at Mr. Stallings, which are used to stop a suspect and identify the suspect for arrest by officers.

126.   During the Lake St. operations, Officer Sundberg sat next to Officer Dauble.

127.   Officer Sundberg saw Unit 1281 officers use improper force, including 40mm rounds, toward civilians on Lake St.

128.   Officer Sundberg took no action to stop or prevent improper use of force by officers.

129.   After Mr. Stallings' shots, officers yelled, "Shots fired!" and dismounted the van with lethal weapons drawn.

130.   At the time of dismount, two marked squads were behind the unmarked van. Although it was night, one marked squad only had running lights but not headlights active. The other marked squad had neither headlights nor running lights active. The caravan of other marked squads were several blocks away from the van.

131.   The marked squads behind the van were not visible to Mr. Stallings when officers in the van fired 40mm rounds at him.

**Mr. Stallings is shot by Unknown Attackers**

132.  Mr. Stallings attended protests opposing police racism and brutality in the days following Mr. Floyd's death.

133.  On May 30, 2020, Mr. Stallings wanted to continue participating in protests. Mr. Stallings was exercising his First Amendment rights to speak and assemble.

134.  Earlier that day, Mr. Stallings learned of threats of white supremacists and other civilians seeking to cause violence at protests.

135.  Due to these potential threats. Mr. Stallings carried a firearm with him when he left for the protests.

136.  On May 30, 2020, Mr. Stallings had a valid permit to carry a firearm. The firearm carried by Mr. Stallings was properly purchased and registered to him.

137.  On May 30, 2020, a curfew was in effect generally preventing civilians from being in public spaces after 8:00 p.m.

138.  Mr. Stallings tried to drive to Cup Foods but was prevented due to roadblocks.

139.  While driving in Minneapolis, Mr. Stallings saw marked police cars conducting law enforcement operations. Although Mr. Stallings was violating curfew and was observed by officers, officers did not take any action toward Mr. Stallings.

140.  When Mr. Stallings could not reach Cup Foods, he followed a line of other cars hoping that they would lead him to a protest site.

141.  At approximately 10:18 p.m., Mr. Stallings ended up in a parking lot ("Parking Lot") on the corner of 14th Ave. and Lake St. in Minneapolis.

142.    While in the Parking Lot, Mr. Stallings saw a caravan of marked MPD squad cars drive eastbound on Lake St. The cars appeared to be on patrol, and many had emergency lights active. At least one MPD car shined a spotlight directly at Mr. Stallings. Although Mr. Stallings was observed violating curfew, the squad cars did not further interact with Mr. Stallings.

143.    At approximately 10:39 p.m., Mr. Stallings left the Parking Lot and proceeded eastbound on Lake St. Mr. Stallings was hoping to find larger groups of protesters.

144.     Mr. Stallings walked a few blocks when he met a civilian who warned him not to go further. The civilian told Mr. Stallings that people were shooting out of a truck.

145.    Because of the warning, Mr. Stallings returned to the Parking Lot.

146.    At approximately 10:52 p.m., Mr. Stallings saw a person run past the Parking Lot from the east on Lake St. The person was running in an alarmed manner and shouting "they're shooting, they're shooting!"

147.    Mr. Stallings was unable to see down Lake St. from the direction where the person was running due to a building that obstructed Mr. Stallings' view.

148.    A member of Mr. Stallings' group went to Lake St. and looked in the direction where the person had run from. The group member quickly turned around and ran in an alarmed manner.

149.    Based on the alarm of the two people, Mr. Stallings feared an approaching threat.

150.   Mr. Stallings turned away from Lake St. toward the rear of his pickup truck. He intended to take cover behind his truck.

151.   Before Mr. Stallings could get into cover behind his truck, he saw that other group members were attempting to enter their vehicles.

152.   Mr. Stallings decided to get into his truck to drive away from the area before the potential threat arrived. Mr. Stallings turned toward the front of his truck, intending to get in and flee the area.

153.   As Mr. Stallings turned toward the front of his truck, a white unmarked van was coming past a building on Lake St.

154.   The white van had no apparent markings or unusual equipment. It looked like a civilian delivery van.

155.   The van was driving slowly with its sliding door open.

156.   The interior of the van was dark, and the occupants were dressed in black tactical gear.

157.   Without warning or announcement, the occupants of the van fired two shots toward Mr. Stallings. The shots sounded like gunshots.

158.   When the shots were fired, Mr. Stallings felt a strong impact to his chest. Mr. Stallings thought that he had been shot in the chest and had sustained life-threatening injuries.

159.   Mr. Stallings became terrified and feared for his life.

160.   Based on prior warnings, the context of the situation, the sudden use of force, the appearance of the van, and other factors, Mr. Stallings believed that civilians were attacking him with one or more lethal firearms.

161.   Mr. Stallings raised his firearm, stopped moving toward the front of his truck, and started to retreat to the rear of his truck.

162.   Mr. Stallings fired three shots toward the ground near the front of the van as he moved toward the rear of his truck.

163.   Mr. Stallings hoped that the shots would disrupt further attacks from the van and cause the van to flee the area.

164.   If Mr. Stallings had not been fired at or struck with a round, Mr. Stallings would not have used force. Mr. Stallings would have entered his truck and left the area.

165.   After Mr. Stallings fired three shots, he was able to get behind his truck into cover.

166.   An occupant in the van fired a third shot toward Mr. Stallings, after Mr. Stallings was in cover.

167.   The van stopped, and the occupants dismounted, yelling "shots fired" and ordering Mr. Stallings and those nearby to get on the ground.

168.   Mr. Stallings had expected civilian attackers to flee after being fired upon. The facts that the van slowed down and the occupants yelled commands surprised Mr. Stallings.

169.   At that moment, Mr. Stallings realized that the occupants in the van were law enforcement officers, not civilians.

**Officers beat Mr. Stallings during the Arrest**

170.   Mr. Stallings immediately discarded his firearm and laid flat on the ground with hands above his head.

171.   Mr. Stallings stayed motionless on the ground for approximately twenty seconds while officers from the van approached.

172.   Officers called out that Mr. Stallings' gun was on the ground.

173.   Officers called out that Mr. Stallings was on the ground.

174.   Officer Stetson was the first to make physical contact with Mr. Stallings.

175.   Officer Stetson could see Mr. Stallings laying face-down on the ground with his hands visible. Officer Stetson could also see Mr. Stallings' gun laying near the back of the truck, out of Mr. Stallings' possession.

176.   Although Mr. Stallings had discarded his weapon and was lying in a submissive position, Officer Stetson repeatedly kicked and struck Mr. Stallings in the head.

177.   Officer Stetson appeared to have hard-knuckle gloves, which increased the force applied to Mr. Stallings.

178.   Sgt. Bittell was the second officer to make physical contact with Mr. Stallings.

179.   Sgt. Bittell ran past Mr. Stallings' firearm, which was on the ground, and began striking Mr. Stallings in the midsection.

180.   While officers were striking Mr. Stallings, Mr. Stallings showed no resistance and minimal defensive movement to shield himself from the strikes.

181.   While being struck, Mr. Stallings asked officers to "listen." However, officers did not and continued striking him.

182.   Officers continued to strike Mr. Stallings even after he put his hands behind his back, as they had commanded.

183.   Officers struck Mr. Stallings for approximately thirty seconds.

184.   While Sgt. Bittell and Officer Stetson were striking Mr. Stallings, another officer repeatedly tased a member of Mr. Stallings' group despite the group member surrendering to officers before they made physical contact.

185.   When the officer who tased the group member later reported the force to Sgt. Bittell, Sgt. Bittell responded that all officers used force and did not inquire further.

186.   Sgt. Bittell appeared to condone the improper use of force by the other officer, as well as use of force generally by all officers involved in the incident.

187.   Following the incident, Mr. Stallings experienced labored breathing and injuries related to the shot that struck his chest.

188.   Mr. Stallings received numerous injuries from the beating during arrest, including a fractured eye socket and bruising.

189.   Mr. Stallings received psychological injuries from the incident, including trauma, paranoia, and anxiety.

190.   Officer Stetson struck Mr. Stallings so hard that Officer Stetson thought that he fractured his hand and foot.

191.   Officer Stetson only stopped striking Mr. Stallings after Sgt. Bittell ordered him to stop twice and put his hand on Officer Stetson's hand to stop further strikes.

192.  Mr. Stallings later learned that officers had fired 40mm marking rounds at him.

193.  One 40mm round struck Mr. Stallings' chest, leaving green marking paint on his sweatshirt.

194.  One 40mm round struck Mr. Stallings' truck's door, causing a significant dent.

195.  One 40mm round struck the passenger-side rear mirror of the truck, cracking the casing.

196.  After the incident, Mr. Stallings was transported to the hospital for evaluation and treatment. At the hospital, Mr. Stallings was not permitted to privately discuss the incident or his injuries with medical personnel. Officers stood nearby and listened to everything that was being discussed.

197.  After the hospital, Mr. Stallings was interviewed by two MPD officers.

198.  During the interview, Mr. Stallings asked if the involved officers were ok. A sergeant told Mr. Stallings that no one was seriously injured. The sergeant reported that Mr. Stallings appeared relieved after hearing that no officers were seriously hurt. The sergeant told Mr. Stallings that he appreciated Mr. Stallings' concern for the involved officers.

199.  Mr. Stallings remained in custody after the interrogation.

**Officers failed to Intervene and Stop Improper Force**

200.  Minneapolis Police Department Policy and Procedure Manual effective on May 30, 2020 ("MPDPPM") 5-303.01 stated that officers had a duty "to either stop or

27

attempt to stop another sworn employee when force is being inappropriately applied or is no longer required."

201.   During the arrest, nearby officers saw that Mr. Stallings had surrendered and that force against him was not required while Sgt. Bittell and Officer Stetson struck him.

202.   Officer Sundberg saw unnecessary force being used against Mr. Stallings and did not intervene. Officer Sundberg later described Mr. Stallings' submission as "fighting" and "struggl[ing]" with officers. Officer Sundberg also reported that Mr. Stallings was "uncooperative."

203.   Sgt. Lokke saw unnecessary force being used against Mr. Stallings and did not intervene. Sgt. Lokke described Mr. Stallings' submission as "resisting the efforts [of officers] to force his hands behind his back." Sgt. Lokke reported this resistance despite Mr. Stallings' physical efforts to comply and Mr. Stallings' verbal statement that he was "trying" to comply.

204.   Sgt. Stenerson saw unnecessary force being used against Mr. Stallings and did not intervene. Sgt. Stenerson reported that Mr. Stallings was "physically fighting with multiple swat officers." Sgt. Stenerson described Mr. Stallings' conduct as "actively resisting arrest."

205.   While Mr. Stallings was being struck, additional officers saw unnecessary force being used and did not intervene. These officers include the Non-intervening Defendants, John Does 1-5.

206.   Officers also observed a pattern of unnecessary 40mm round usage that culminated in shots fired toward Mr. Stallings. Officers failed to intervene and prevent these shots from occurring or continuing.

207.   Officers' failure to intervene and report improper use of force violated MPD policies.

## MPD Policies limit Use of Force

208.   MPDPPM 9-103(A) directed that officers must issue a citation in lieu of arrest for misdemeanor offenses unless an arrest was necessary to prevent bodily harm to the accused or another, to prevent further criminal conduct, or because of substantial likelihood that the accused will fail to respond to a citation. In that situation, officers must be able to articulate why an arrest was necessary rather than a citation.

209.   Officers are trained that they may not use more force than necessary for a lawful purpose.

210.   Officers are trained in applicable legal and constitutional requirements for use of force generally and during arrest.

211.   Unit 1281 officers were aware of legal and constitutional requirements and limits regarding their use of force toward civilians.

212.   Officers were aware that force was least justified against non-violent misdemeanants.

213.   Unit 1281 officers were aware that penalties and negative consequences could occur due to their improper use of force.

214.   MPDPPM 5-300(A) stated that "Sanctity of life and the protection of the public shall be the cornerstones of the MPD's use of force policy."

215.   MPDPPM 5-301.01 stated that "Based on the Fourth Amendment's 'reasonableness' standard, sworn MPD employees shall only use the amount of force that is objectively reasonable in light of the facts and circumstances known to that employee at the time force is used. The force used shall be consistent with current MPD training."

216.   MPDPPM 5-303 required officers to use reasonable force toward civilians. It required officers to consider the *Graham v. Connor* factors, taking into account the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Officers were directed to "write a detailed, comprehensive report for each instance in which force was used."

217.   MPDPPM 5-304(A) directed officers to "consider verbally announcing their intent to use force" as an alternative or precursor to the actual use of force.

218.   MPDPPM 5-304(B) directed officers to "use de-escalation tactics to gain voluntary compliance and seek to avoid or minimize use of physical force." Officers were directed to "slow down and stabilize the situation" so that more time, options, and resources would be available. De-escalation tactics included communication, such as advisements and warnings, and avoidance of physical confrontation unless immediately necessary.

219.   MPDPPM 5-305(A) directed that officers could use deadly force only when necessary. Deadly force was authorized to protect an officer or another from apparent death or great bodily harm, to arrest or capture a felony suspect involving the use or threatened

30

use of deadly force, or to arrest or capture a felony suspect when the officer reasonably believed that the suspect would cause death or great bodily harm if apprehension was delayed.

220.   MPDPPM 5-305(B) directed officers to consider the constitutional requirements explained in *Tennessee v. Garner*. Officers were directed that apprehension by use of deadly force is subject to Fourth Amendment reasonableness requirements. Officers were directed that the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.

221.   MPDPPM 5-305(C) required officers to recognize that the use of less-lethal weaponry may constitute deadly force.

222.   MPDPPM 5-305(F) required officers to use reasonableness, sound tactics, and available options during encounters to maximize the likelihood that they could safely resolve the situation. It further explained that a "lack of reasonable or sound tactics [could] limit options available to officers, and unnecessarily place officers and the public at risk."

223.   MPDPPM 5-312 stated that officers were to avoid using less-lethal weaponry in civil disturbances unless there was an immediate need to protect oneself or another from apparent physical harm or if authorized by the on-scene incident commander.

224.   MPDPPM 5-317(I)(A) stated that "combative, non-compliant, armed, or otherwise violent subjects cause handling and control problems that require special training and equipment." The MPD adopted a "less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations."

225.   MPDPPM 5-317(II) defined a 40mm less-lethal round as a "Direct fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-compliant subject."

226.   MPDPPM 5-317(III)(B), which did not apply to SWAT officers, stated that a 40mm less-lethal round should be considered "a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the suspect's body that are considered unlikely to cause death or serious physical injury." It directed officers to "consider any risks to the public and themselves" before using less-lethal weaponry. It also directed officers to consider "whether the subject could be controlled by any other reasonable means without unnecessary risk to the subject, officers, or to the public." Non-SWAT officers were directed to refrain from 40mm launcher use for crowd management purposes.

227.   MPDPPM 5-317(IV)(B) described target areas for 40mm round use. It stated that the "primary target areas for the 40mm less-lethal round should be the large muscle groups in the lower extremities including the buttocks, thigh, knees. Alternative target areas include the ribcage area to the waist, and the larger muscle areas of the shoulder areas. Areas to avoid when using the 40mm less-lethal round are the head, neck, spinal cord, groin and kidneys." It required officers to be aware that "the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to a permanent physical or mental incapacity or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest (in the vicinity of the heart).

Unless deadly force is justified, officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas."

228.   MPDPPM 5-317(IV)(C)(1) stated that "40mm launchers can be used when the incapacitation of a violent or potentially violent subject is desired. The 40mm launcher can be a psychological deterrent and physiological distraction serving as a pain compliance device."

229.   MPDPPM 5-317(IV)(C)(3) stated that "It is important that whenever possible, all officers involved and possible responding officers know that a 40mm less-lethal projectile is being deployed so they do not mistake the sight and noise from the deployment as a live ammunition discharge." It also stated that "40mm launchers have an orange barrel indicating they are the less-lethal platform."

230.   MPDPPM 5-317(IV)(C)(4) required officers to yell "Code Orange!" prior to and during firing when using 40mm launchers.

### Officers use Improper Force

231.   Officer Cushenbery fired a 40mm round toward Mr. Stallings' group. Officer Cushenbery directed his shot toward the target's torso.

232.   Officer Cushenbery claimed that he fired the shot to disperse the group.

233.   Officer Cushenbery did not see anyone in the Parking Lot moving until after he fired his 40mm round.

234.   When Officer Cushenbery fired, Unit 1281 officers had not observed a safety threat from the group in the Parking Lot.

235.    Officer Cushenbery knew that firing a 40mm round out of an unmarked van toward unsuspecting civilians could create a safety risk. Officer Cushenbery knew that a person fired upon in that manner may feel threatened and may use responsive force to protect against an apparent lethal attack. This would result in increased violence and put officers and civilians in increased risk of harm.

236.    Officers failed to use available alternatives to interact with Mr. Stallings' group.

237.    Unit 1281 officers knew that civilians would flee at the mere sight of law enforcement.

238.    Unit 1281 did not use a conspicuous presence or announce their status as law enforcement to disperse Mr. Stallings' group.

239.    Sgt. Bittell knew that officers could have used a verbal command to disperse Mr. Stallings' group. Officers did not use verbal commands to disperse the group.

240.    Sgt. Bittell knew that the van's emergency lights could have been activated when coming upon Mr. Stallings' group. Officers did not activate the emergency lights to disperse or stop the group.

241.    Officers could have waited and observed Mr. Stallings' group before using force. Officers did not make additional observations to see if substantial criminal activity or a safety threat existed or to determine whether use of force was necessary.

**Officers Conceal and Misrepresent Material Facts**

242.    After the incident, other officers quickly responded to the Parking Lot. The officers asked members of Unit 1281 what happened.

243.    Sgt. Bittell initially told other officers that Mr. Stallings "shot at [officers]" and then "gave up."

244.    When another officer asked Sgt. Bittell how Mr. Stallings was injured, Sgt. Bittell said that Mr. Stallings was "resisting when [officers] came up on him." The other officer did not question Sgt. Bittell's claim and did not investigate further.

245.    When a third officer asked what happened, Sgt. Bittell claimed that Mr. Stallings "started to give up" but then "resisted." The officer did not question Sgt. Bittell's claim and did not investigate further.

246.    At the scene, multiple officers noted that Mr. Stallings was having breathing issues.

247.    At the time, Mr. Stallings had green paint on his chest from a 40mm marking round. Despite the paint mark, no officer reported that the breathing issues were likely from being struck by a 40mm round. In fact, no officer reported that Mr. Stallings had been struck by a 40mm round at all.

248.    When officers at the scene were asked whether anyone had "shot," officers did not admit that they shot at Mr. Stallings with 40mm rounds.

249.    An officer evaluating Mr. Stallings on the scene told other officers that the breathing issues were probably due to narcotics use. The officer failed to investigate the green paint mark on Mr. Stallings' chest.

250.    When discussing Mr. Stallings' condition, an officer referred to Mr. Stallings' injuries as "fakeitis."

35

251. Officers did not document or report injuries suffered by Mr. Stallings when he was shot by a 40mm round or during the arrest when Sgt. Bittell and Officer Stetson beat him.

252. Commander Folkens served as a police commander on May 30, 2020. In that role, Commander Folkens was responsible for planning and supervision of MPD activities.

253. While the Parking Lot was being processed by investigators, Commander Folkens said that it was "nice to hear" that officers were "hunting people" that evening. Commander Folkens then said "f*** these people," referring to the civilians that officers were hunting.

254. Other officers, besides Commander Folkens, referred to "hunting" and "ambushing" civilians that evening.

255. Hunting-style tactics include concealing approach and initiating a surprise attack on an unsuspecting target.

256. The manner in which MPD officers attacked Mr. Stallings was consistent with the hunting operation referenced by Commander Folkens.

257. Earlier in the evening, a member of Unit 1281 joked that they were "hunting activists."

258. Commander Folkens described a plan to hunt civilians by MPD officers on May 30, 2020. Commander Folkens demonstrated knowledge and approval of these hunting operations.

259. Commander Folkens expressed malice toward those being hunted by MPD officers.

260.    The day after the incident, involved officers gave verbal statements and wrote reports. Officers' accounts were contradictory and did not match the incident as captured on video recordings. Officers misstated their directives and gave varying accounts for their use of force. Officers exaggerated the threat presented by Mr. Stallings before force was used and during his arrest.

261.    Officers did not accurately describe their concealed appearance, their initial use of force toward Mr. Stallings, and the fact that Mr. Stallings had been struck by a 40mm round in the chest.

262.    Instead, officers suggested that Mr. Stallings provoked officers, that officers' appearance was conspicuous, and that Mr. Stallings continued to present a threat during his arrest.

263.    Officers knew that they used unjustified force against Mr. Stallings during the initial encounter and arrest.

264.    In order to avoid negative consequences due to improper force, officers provided misleading and false statements to justify or conceal their use of force.

265.    Officers misrepresented and concealed evidence to implicate Mr. Stallings and impair his ability to prove self-defense.

266.    Other officers relied on these false and misleading statements to steer the investigation, even when the statements were facially false or conflicted with other evidence, such as video recordings.

267.    Sgt. Jensen and Sgt. Heyer led the investigation of the incident involving Mr. Stallings and Unit 1281. They acted as investigators themselves and supervised other

officers participating in the investigation. Sgt. Lokke, Commander Folkens, and other officers also participated in the investigation.

268.   Video recordings showed that statements and reports made by involved officers were false.

269.   Video recordings showed that officers failed to report material facts.

270.   Video recordings showed that officers used improper force against Mr. Stallings.

271.   Video recordings showed an intentional effort to conceal Unit 1281's appearance on Lake St. so that officers could shoot at civilians with 40mm rounds.

272.   Officers had physical evidence, including Mr. Stallings' sweatshirt, which showed that Mr. Stallings was struck by a round before using responsive force.

273.   These facts, as well as others, were not documented by investigators. Investigators did not further investigate these facts.

274.   Officers who responded to the Parking Lot after the incident expressed doubts about the narrative put forth by Unit 1281 officers. Responding officers expressed concerns about allegations that Mr. Stallings tried to ambush or attack persons that he knew were officers. Officers at the scene suggested that this narrative was not credible.

275.   These doubts were not reported by officers. These doubts were not further investigated, and evidence supporting these doubts was not collected or documented.

276.   Sgt. Jensen reported that evidence supported Officer Dauble's statement provided in an interview. However, video evidence did not match Officer Dauble's statement.

277.  For example, Officer Dauble claimed that Unit 1281 was patrolling on Lake St. to clear out looters and people out after curfew. Video recordings showed that Unit 1281 was directed to shoot at people on Lake St. with 40mm rounds.

278.  Officer Dauble claimed that large groups were looting and throwing rocks at Unit 1281 on Lake St. Video recordings do not show this activity occurring.

279.  Officer Dauble claimed that he fired a 40mm round in response to a crouching motion made by Mr. Stallings. Officer Dauble claimed that he thought that Mr. Stallings was going to throw something at the van.

280.  Video recordings show that Officer Osbeck called out Mr. Stallings' group to be shot with 40mm rounds. Sgt. Bittell ordered officers to shoot Mr. Stallings' group. Officer Cushenbery shot at Mr. Stallings, which caused Mr. Stallings to crouch in response. Officer Stetson then shot at Mr. Stallings. Mr. Stallings fired shots toward the van while getting into cover. Officer Dauble fired at Mr. Stallings' truck after Mr. Stallings had fired and was in cover.

281.  Investigating officers failed to document evidence of improper conduct by officers.

282.  Investigating officers failed to document evidence supporting the exercise of self-defense by Mr. Stallings.

283.  Investigating officers failed to follow up on leads suggesting that Mr. Stallings was acting in self-defense.

284.   Upon information and belief, involved officers were not investigated for misconduct during the pendency of the criminal proceedings, which lasted more than a year.

285.   Upon information and belief, no disciplinary action was taken toward any involved officers during the pendency of the criminal proceedings.

286.   Sgt. Jensen included false and misleading facts in the statement of probable cause in the criminal complaint against Mr. Stallings. Sgt. Jensen omitted material exculpatory evidence that undermined and contradicted allegations made in the complaint.

### Mr. Stallings is acquitted of all Criminal Charges

287.   Mr. Stallings was charged with eight counts of criminal activity, including attempted murder and assault. The complaint's statement of probable cause included false and misleading statements given by Unit 1281 officers suggesting that Mr. Stallings provoked the use of force by officers, Mr. Stallings had notice that the people in the van were officers, and Mr. Stallings resisted arrest and continued to pose a threat to officers.

288.   Mr. Stallings was taken into custody and was required to post bail to secure his release.

289.   Due to the criminal charges, Mr. Stallings was deprived of property, including his truck, for the duration of the proceedings. Mr. Stallings also lost his ability to possess firearms.

290.   After charges were filed, the Hennepin County Attorney's Office issued a press release describing the allegations in the criminal complaint. The press release contained false and misleading statements given by the involved officers. The press release

omitted the first shot fired by officers toward Mr. Stallings and the fact that Mr. Stallings was hit in the chest with a 40mm round. The press release claimed that Mr. Stallings "ran away" requiring officers to "searc[h] for him." The press release claimed that officers "struggle[d]" with Mr. Stallings during the arrest. The press release also falsely stated that Mr. Stallings was not injured during the incident.

291.    Many news outlets reported accounts consistent with the false and misleading reports given by the involved officers. Mr. Stallings' case received national coverage.

292.    Due to the false and misleading statements of the involved officers, Mr. Stallings' picture and charges were used as part of a national advertisement in support of the President Trump reelection campaign. The advertisement used Mr. Stallings' booking photo and labelled him an "attempted cop killer."

293.    During criminal proceedings, officers continued to report false and misleading facts.

294.    After a jury trial, Mr. Stallings was acquitted of all charges.

295.    Dissemination of the false narrative that Mr. Stallings attempted to kill officers has continued even after his acquittal. For example, on September 8, 2021, Minnesota State Senator Mark Koran promoted a video on Facebook that stated that "DEMOCRATS WANT to keep bailing out violent criminals" with a photo of Mr. Stallings and a description of the false allegations used during his prosecution.

296.    Due to the criminal charges, Mr. Stallings was unable to speak publicly about the events or rebut the false allegations while the matter was pending. Such comments would have impaired Mr. Stallings' right to remain silent during the criminal proceedings.

297.    Due to the incident, false statements, and subsequent events, Mr. Stallings' reputation has been irreparably harmed.

298.    Mr. Stallings has incurred a stigma due to the allegations and criminal charges made against him, which were premised on false and misleading accounts by involved officers.

299.    Mr. Stallings has endured physical pain and suffering due to his encounter with officers on May 30, 2020.

300.    Mr. Stallings has experienced fear, terror, and psychological suffering due to his encounter with officers on May 30, 2020.

301.    Mr. Stallings' participation in further protests against police racism and brutality was impaired due to his encounter with officers on May 30, 2020.

**The MPD has Customs and Patterns of violating Constitutional Rights**

302.    Defendant City of Minneapolis has informal policies and customs of violating the constitutional rights of individuals in a similar manner as the violations suffered by Mr. Stallings. The violations by the MPD have been widely reported and were generally known before and at the time of the incident involving Mr. Stallings.

303.    The City of Minneapolis had notice of patterns of unconstitutional actions by its officers. It was deliberately indifferent and tacitly authorized these violations. Due to

insufficient supervision and lack of training, Mr. Stallings was injured as part of these patterns.

### The MPD uses Improper Force against Protesters and Journalists

304.    The MPD has a custom of improperly using 40mm rounds and other force toward civilians.

305.    Supervisors ordered subordinate officers to carry out an operation of violence and force toward non-violent curfew violators and civilians who were exempt from the curfew.

306.    Supervisors ordered subordinate officers to avoid non- or less-forceful measures to engage with suspected curfew violators and other civilians.

307.    Officers carried out violent operations throughout May 30, 2020 and the surrounding days at multiple locations.

308.    These incidents have been documented in other lawsuits alleging constitutional violations by the MPD during the George Floyd protests.

309.    Officers carried out violent operations without any effort by supervisors to restrict, alter, or prevent improper force used against civilians.

310.    The MPD failed to adequately train officers as to the proper circumstances and methods in which to use 40mm rounds toward civilians.

311.    Due to improper training, officers believed that they could fire 40mm rounds at peaceful curfew violators without trying less-forceful alternatives, announcements, or warnings.

312.    Due to improper training, officers believed that they could target a civilian's torso with 40mm rounds in circumstances other than those in which deadly force was authorized.

313.    The MPD failed to provide adequate supervision of officers using 40mm rounds.

314.    Due to inadequate supervision, the MPD did not correct or prevent improper 40mm round use.

315.    The MPD has a custom of improperly using crowd-control weaponry to violate a person's constitutional rights.

316.    In May and June 2020, during the George Floyd protests, the MPD repeatedly used 40mm rounds and other crowd-control weapons toward persons who were not engaged in significant criminal activity or posing a threat to the safety of officers or others. Officers used force without announcement or warning and did so in a manner that caused serious injury and risk of death. Officers did so on multiple days and in multiple incidents. Several incidents were the subject of reporting. The incidents were also widely shared on social media and generated significant complaints regarding officers' conduct.

317.    On May 29, 2020, an MPD officer fired a less-lethal round and struck a protester in the face. Officers fired without a verbal command, and the protester was only violating curfew at the time.[5]

---

[5] Randy Furst, *College student sues city of Minneapolis over eye injury from projectile during Floyd protests*, STARTRIBUNE, Sep. 15, 2020, https://www.startribune.com/college-student-sues-city-of-minneapolis-over-eye-injury-from-projectile-during-floyd-protests/572420452/.

318.    On May 31, 2020, an MPD officer fired a less-lethal round and struck a protester in the face. Officers fired without warning or provocation. This and other similar incidents led to more than 400 complaints against the MPD during the protests.[6]

319.    On May 30, 2020, an MPD officer pushed a reporter to the ground at a gas station. Another officer pepper-sprayed the reporter. The use of force occurred without existence of significant criminal activity or a safety threat to officers.[7]

320.    On or about June 2, 2020, officers who appeared to be MPD officers fired less-lethal projectiles at a resident on their front porch. The officer fired without evidence of significant criminal activity or the existence of a safety threat.[8]

321.    On May 30, 2020, an MPD officer shot a less-lethal projectile at a reporter who had announced her status. The officer fired without evidence of significant criminal activity or the existence of a safety threat from the reporter.[9]

---

[6] Liz Sawyer & Libor Jany, *Complaints skyrocket over police response to George Floyd protests*, STARTRIBUNE, July 2, 2020, https://www.startribune.com/complaints-skyrocketing-in-wake-of-mpls-police-response-to-floyd-protests/571608232/.

[7] Michael Anthony Adams, *I Told Riot Cops I'm a Journalist. They Forced Me to the Ground and Pepper-Sprayed Me in the Face*, VICE NEWS, May 31, 2020, https://www.vice.com/en/article/y3zd7g/i-told-riot-cops-im-a-journalist-they-forced-me-to-the-ground-and-pepper-sprayed-me-in-the-face.

[8] Joshua Bote, *'Light 'em up': Minneapolis officers seen firing paint rounds at people on their porch*, USA TODAY, June 2, 2020, https://www.usatoday.com/story/news/nation/2020/06/02/george-floyd-protest-minneapolis-cops-shoot-paint-people-porch/3123781001/.

[9] Paul Walsh, *Photographer amid Minneapolis unrest sues, says officers blinded her in eye with nonlethal shot*, STARTRIBUNE, June 16, 2020, https://www.startribune.com/photographer-sues-says-officers-blinded-her-in-eye-with-nonlethal-shot-during-mpls-unrest/571266322/.

322.    These activities are also consistent with improper use of crowd-control weapons by the MPD during other protests.

323.    On May 13, 2015, MPD officers used crowd-control weapons against a group of protesters who were not engaged in significant criminal activity or posing a safety threat to officers.[10]

324.    On November 15, 2015, MPD officers used crowd-control weapons against protesters who did not move out of an area quickly enough. Officers used force against compliant protesters who were not presenting a safety threat.[11]

325.    Minneapolis City Council members and other figures publicly criticized the MPD's excessive force against protesters. On or about May 28, 2020, Minneapolis City Council member Jeremiah Ellison said that the "police in the city failed us" after using improper force against protesters.[12]

326.    The officers' improper targeting and use of 40mm rounds at Mr. Stallings is consistent with 40mm round shots by other MPD officers throughout the George Floyd protests. Officers targeted non-violent civilians and used force without warning or

---

[10] Nicole Norfleet & Paul Walsh, *Minneapolis mayor and police chief ask for witnesses to come forward in protest investigation*, STARTRIBUNE, May 15, 2015, https://www.startribune.com/mpls-officials-want-witnesses-for-protest-investigation/303757551/.

[11] Eric Roper, *Lawsuit claims police used excessive force during protest at Fourth Precinct*, STARTRIBUNE, Jan. 6, 2016, https://www.startribune.com/lawsuit-claims-police-used-excessive-force-during-protest-at-fourth-precinct/363690041/.

[12] Andy Mannix & Miguel Otárola, *Minneapolis council member: 'Police in the city failed us' in protest response*, STARTRIBUNE, May 28, 2020, https://www.startribune.com/minneapolis-council-member-ellison-police-in-the-city-failed-us-last-night/570803722/.

necessity. Officers targeted high-risk areas, such as center mass and heads, sometimes causing severe injury.

327.   Shots to persons' chests and heads were widely reported during the George Floyd protest, providing notice to the MPD that officers were improperly targeting civilians with 40mm rounds.

328.   The MPD did not appear to undertake training to prevent improper 40mm use toward civilians, such as Mr. Stallings.

329.   Other officers, including supervisors, observed improper 40mm round use toward civilians during the George Floyd protests.

330.   The MPD did not provide adequate supervision to prevent improper 40mm use toward civilians, such as Mr. Stallings.

**MPD Officers use Excessive Force during Arrests**

331.   The MPD has a custom of using excessive force during arrests. This custom includes the use of strikes or other force against persons who have submitted, are restrained, or are otherwise posing no safety or flight risk.

332.   Officers have used improper force multiple times over multiple years. Since 1995, MPD officers punched, kicked, or assaulted at least eleven suspects who were restrained. [13] On May 25, 2020, officers continued this pattern when Derek Chauvin used improper and excessive force to murder George Floyd during an arrest.

---

[13] Libor Jany, *Chauvin case shines spotlight on Minneapolis police history of mistreatment of handcuffed suspects*, STARTRIBUNE, Apr. 2, 2021, https://www.startribune.com/chauvin-case-shines-spotlight-on-minneapolis-police-history-of-mistreatment-of-handcuffed-suspects/600041721/.

333.   The pattern of excessive force used by the MPD during arrests and, in particular, the improper force used during Mr. Floyd's arrest received substantial reporting and attention.

334.   On May 30, 2020, Officer Stetson used excessive force toward a protester who had submitted to officers by striking the protester in the head with a 40mm launcher.

335.   Officers arresting another member of Mr. Stallings' group used excessive force by tasing him repeatedly after he had submitted.

336.   Other officers, including supervisors, observed these and other uses of excessive force by officers against suspects who had surrendered or were restrained.

337.   Other officers, including supervisors, observed officers using excessive force toward Mr. Stallings during his arrest. Those officers did not report the excessive force and did nothing to prevent or deter it from occurring.

338.   The MPD failed to provide adequate training or supervision to prevent officers from using improper force during arrests toward suspects who had submitted or surrendered, such as Mr. Stallings.

### The MPD improperly targeted Black Persons

339.   The MPD has a custom of improperly targeting and using excessive force against Black people.[14] Data showed that African-Americans made up about 20 percent of Minneapolis's population, yet they were more likely to be pulled over, arrested, and have

---

[14] Matt Furber, John Eligon, & Audra D.S. Burch, *Minneapolis Police, Long Accused of Racism, Face Wrath of Wounded City*, N.Y. TIMES, May 27, 2020, updated April 5, 2021, https://www.nytimes.com/2020/05/27/us/minneapolis-police.html.

force used against them than white residents. Black people accounted for more than 60 percent of victims in Minneapolis police shootings from late 2009 through May 2019. In 2018, an MPD officer fatally shot a Black man who was fleeing from police. In 2015, an MPD officer fatally shot a Black man who was in custody on the ground. In 2020, MPD officers used excessive force resulting in the death of Mr. Floyd, who was a Black man.

340.    A news investigation found that MPD officers used force against Black people at seven times the rate of white people. Although Minneapolis's population was only 20% Black, nearly 60% of incidents involving police use of force involved a Black person. A professor studying the MPD described their operations as "a living laboratory on everything you shouldn't do when it comes to police use of force." The professor found "a pattern that goes back at least a generation."[15]

341.    In 1989 a Black couple died of smoke inhalation when MPD officers flash-bombed a home during a raid. In 2002, a Black boy was hit in the arm by a bullet fired by officers. In 2012, a Black man was beaten by off-duty MPD officers who used racial slurs. In 2015, a Somali-American was pulled over by an officer who threatened to break the Somali-American's legs.[16]

---

[15] Richard A. Oppel Jr. & Lazaro Gamio, *Minneapolis Police Use Force Against Black People at 7 Times the Rate of Whites*, N.Y. TIMES, June 3, 2020, https://www.nytimes.com/interactive/2020/06/03/us/minneapolis-police-use-of-force.html.

[16] Amudalat Ajasa & Lois Beckett, *Before Chauvin: decades of Minneapolis police violence that failed to spark reform*, THE GUARDIAN, Apr. 25, 2021, https://www.theguardian.com/us-news/2021/apr/25/minneapolis-police-incidents-promises-reform.

342.    The George Floyd protests were comprised of Black civilians and others who opposed systemic racism against Black persons. The MPD's response to the protesters was more forceful and severe than responses to other protests that involved non-racial issues or were comprised primarily of white participants.[17]

343.    The disproportionate use of excessive force toward Black persons by the MPD combined with evidence of racial animus by officers demonstrates a custom of improperly targeting and using force against Black persons and their allies.

344.    On May 30, 2020, supervisors observed officers targeting Black people with force during the George Floyd protests. In fact, the use-of-force supervisor, Lt. Mercil, suggested that non-white civilians were more likely to commit looting and arson based solely on their race.

345.    During the George Floyd protests, officers falsely claimed that Black civilians were looters and rioters without actual evidence to support those suspicions. Mr. Stallings was also the subject of racially-motivated suspicion, and he was targeted with force due to his race.

---

[17] Li Zhou & Kainaz Amaria, *These photos capture the stark contrast in police response to the George Floyd protests and the anti-lockdown protests*, VOX, May 27, 2020, https://www.vox.com/2020/5/27/21271811/george-floyd-protests-minneapolis-lockdown-protests; Bill Strande, *One arrest, one citation outside Trump rally in Minneapolis*, KARE 11, Oct. 10, 2019, updated Oct. 11, 2019, https://www.kare11.com/article/news/local/trump-protesters-outside-target-center-minneapolis/89-8c9d0ec8-7257-4694-9a0a-9bbfd038f623.

346.    The MPD failed to adequately train officers to avoid racially-motivated suspicion and use of force. The MPD also failed to provide adequate supervision to avoid racially-discriminatory enforcement and use of force.

**MPD Officers fail to Report, Investigate, or Punish Constitutional Violations**

347.    The MPD has a custom of permitting officers to make self-serving and false statements in reports regarding excessive force or other violations of constitutional rights. The MPD has a custom of failing to investigate or discipline officers when there is evidence suggesting that a violation of constitutional rights occurred.

348.    These customs include concealing an officer's improper use of force and the fabrication of aggression or threat on behalf of a suspect to falsely justify the force used by officers.

349.    These customs allow officers to violate constitutional rights with impunity. By permitting these customs, the MPD encourages and condones constitutional violations, such as those that occurred to Mr. Stallings.

350.    Over multiple years and in multiple incidents, officers have provided misleading or false reports to conceal improper use of force. Officers have also exaggerated the threat posed by a suspect to falsely justify use of force.

351.    In 2006, MPD officers falsely claimed that a suspect resisted and tried to grab an officer's gun. Officers fatally shot the suspect. It was later found that officers provided false and misleading testimony to support their use of force. In 2008, an officer punched a man and falsely claimed that the man was resisting. In 2009, officers failed to report an illegal strip search of a suspect. An investigator in that incident stated that officers would

leave information out of reports "if they knew that those actions…violated somebody's rights." In 2010, officers provided a false reason for a traffic stop and then failed to report significant force used against a suspect during the arrest. In 2013, an officer falsely claimed that frosty road conditions led his vehicle to strike a pedestrian. In 2020, the MPD put out false statements describing officers' encounter with Mr. Floyd. That statement minimized officers' use of force that led to Mr. Floyd's death. Since the early 2000s, approximately 25 legal settlements have been paid by the City of Minneapolis in response to allegations of officers falsifying reports or omitting details regarding use of force. In at least six cases, officers continued to provide false or misleading statements until contradicted by video evidence or a judge's ruling. Despite the false statements, officers are often not disciplined and are permitted to continue working without adverse consequences. In some instances, other officers turned off recorders or otherwise interfered with investigations of officers' wrongdoing.[18]

352.   The MPD has failed to adequately discipline officers for constitutional violations. In 2012, MPD officers failed to report use of force against a suspect in custody, including kneeling on her back until she could not breathe and then dragging her out by handcuffs. One officer was suspended for only 10 hours and was later promoted. In 2014, an MPD officer, while working off-duty, used chemical irritant on a bar manager and hit several other people nearby. The officer was suspended for 10 hours and prohibited from

---

[18] Ryan Raiche & Joe Augustine, *JUSTIFYING THE FORCE: Initial description of George Floyd's death fits larger pattern at MPD*, KSTP, July 21, 2020, updated Apr. 16, 2021, https://kstp.com/news/justifying-the-force-initial-description-of-george-floyds-death-fits-larger-pattern-at-minneapolis-police-department/5801211/.

certain off-duty work for 90 days. The officer was subsequently promoted to sergeant. In 2016, MPD officers punched a handcuffed suspect in the face. Disciplinary action took more than two years, during which the officers were promoted to training officers. The police chief's attempt to terminate the officers was overturned by an arbitrator. Current and former MPD officers described knowledge of a pattern of problem officers and the absence of effective measures to curb or eliminate problem behavior.[19]

353.    MPD officers' use of force toward protesters in May 2020 and other incidents have resulted in few investigations or disciplinary actions. The MPD is aware of the issue but has failed to take effective measures to correct it.[20]

354.    Officers who encountered Mr. Stallings failed to accurately describe the nature and use of 40mm rounds toward Mr. Stallings in statements and reports.

355.    Officers concealed that they were explicitly directed to fire at civilians on Lake St. with 40mm rounds.

356.    Officers claimed that Mr. Stallings made a threatening crouching motion while failing to report that Mr. Stallings' crouching motion was in response to an officer firing a 40mm round in his direction.

---

[19] Max Nesterak & Tony Webster, *The Bad Cops:How Minneapolis protects its worst police officers until it's too late*, MINNESOTA REFORMER, Dec. 15, 2020, https://minnesotareformer.com/2020/12/15/the-bad-cops-how-minneapolis-protects-its-worst-police-officers-until-its-too-late/.
[20] Dennis Wagner, *Minneapolis Police Injured Protesters With Rubber Bullets. The City Has Taken Little Action.*, KAISER HEALTH NEWS, May 26, 2021, https://khn.org/news/article/george-floyd-protests-what-happened-police-who-shot-rubber-bullets/.

357.   Officers claimed that Mr. Stallings fired toward the van without any provocation.

358.   Officers falsely claimed that Mr. Stallings resisted during arrest.

359.   When another officer reported use of force during the arrest of a member of Mr. Stallings' group to Sgt. Bittell, Sgt. Bittell condoned the use of force and suggested that the use of force was, in fact, permissible.

360.   MPD policies required officers to document Mr. Stallings' injuries that he received due to officers' use of force. Officers failed to document or report said injuries.

361.   MPDPPM 7-810.01 defined a critical incident as an incident involving the use of deadly force by or against an MPD officer, death or great bodily harm to an officer, death or great bodily harm to a person who is in the custody or control of an officer, or any action by an officer that causes or is intended to cause death or great bodily harm.

362.   MPDPPM 4-223(IV)(A)(7)(b) directed that all involved, witness, and escort officers in a critical incident must leave their BWCs activated on scene until directed by the Incident Commander. Deactivation was only permitted after Public Safety Statements were completed.

363.   MPDPPM 7-810.02 required officers to immediately notify that a critical incident has occurred. Upon that notification, the Incident Commander was required to determine the identify of Involved and Witness Officers, take a Public Safety Statement from Involved Officers, assign Escort Officers to Involved and Witness Officers, keep the Involved and Witness Officers separated from each other, designate an officer to complete the CAPRS report, and brief investigators upon their arrival at the scene.

54

364.    MPDPPM 7-810.03 recognized that officers involved in critical incidents can be profoundly affected by the incident. At the scene, Involved Officers shall not talk to anyone about the incident, except to the Incident Commander, Lead Investigator, a Federation representative or legal counsel. Escorts were to keep Involved and Witness Officers separate. After a critical incident, Involved Officers shall be placed on a mandatory paid administrative leave for a minimum of three calendar days and a maximum of seven calendar days unless requested by the officer and approved by the Chief or his designee.

365.    Officers failed to abide by critical incident policies regarding body-worn camera recordings, sequestration of involved officers, and other procedures designed to maintain the integrity of an investigation.

366.    The failure to abide by critical incident policies allowed involved officers to compare and corroborate statements before any were officially recorded. Other officers failed to ensure reliability and integrity as to the reports of the involved officers.

367.    MPDPPM 5-317(IV)(F)(2) directed officers to take photographs of any suspects injured by 40mm rounds.

368.    Although Mr. Stallings was struck in the chest by a 40mm round, officers did not photograph the paint on his sweatshirt or injuries sustained due to the round's impact.

369.    The failure to document the injuries and effects of force on Mr. Stallings concealed the nature and extent of force used against him by officers.

370.    MPDPPM 5-306 required officers to make a CAPRS report and supervisor notification upon use of force. Another supervisor was to conduct the force review.

371.   MPDPPM 5-307 required a supervisor who is notified of a use of force incident to determine if the incident meets the critical incident criteria, have the subject of the use of force remain on scene until a supervisor arrives, and conduct a preliminary investigation of the use of force incident. The preliminary investigation included debriefing the officer who used force, note injuries to any individual involved, photograph the force subject as well as the surrounding area, ensure on-scene evidence is preserved and collected, locate and identify witnesses to the use of force incident, obtain statements from witnesses to the use of force incident, and contact the Internal Affairs Unit Commander if the force appears to be unreasonable or constitute possible misconduct. The supervisor was also to review reports and supplements related to the use of force incident for completeness and accuracy.

372.   Officers misrepresented the conspicuousness of their appearance as law enforcement upon their approach to Mr. Stallings. Officers omitted evidence that they intentionally concealed their appearance as law enforcement during their drive down Lake St.

373.   Other officers failed to report misconduct and false and misleading statements by involved officers.

374.   Investigating officers failed to pursue leads or investigate whether Mr. Stallings acted in self-defense, whether officers misrepresented facts or made false statements, and whether involved officers acted improperly or in a criminal manner when they engaged Mr. Stallings.

375.    Officers failed to investigate and document exculpatory evidence, such as the marking round paint in the center of Mr. Stallings' sweatshirt, showing that Mr. Stallings was struck by a marking round in the chest before he fired toward the van.

376.    Other officers and supervisors observed that false and misleading statements were provided. However, those officers failed to take any action to correct or prevent those issues.

377.    The involved officers do not appear to have received any disciplinary actions despite overt instances of constitutional violations.

378.    Despite the participation of numerous officers and investigators, no investigation into the constitutional violations committed by the involved officers appeared to begin until after the conclusion of criminal proceedings against Mr. Stallings.

379.    The involved officers gave false and misleading testimony during Mr. Stallings' criminal proceedings, and it does not appear that any corrective measures or disciplinary actions have been taken by the MPD.

380.    Mr. Stallings suffered violations of his constitutional rights because officers were able to engage in improper conduct without fear of investigation or punishment.

**Lt. Kroll uses his Position to Encourage and Cause Constitutional Violations**

381.    During the incident with Mr. Stallings, Lt. Kroll was a lieutenant in the MPD and the president of the Minneapolis Police Federation (the "Federation"), which was the union that represented MPD officers. Lt. Kroll acted as an informal supervisor and policymaker due to his role as Federation president. Lt. Kroll's opinions and directives influenced officers' operations and tactics by providing guidance to members of the MPD.

Lt. Kroll's status as an MPD officer made him eligible to be Federation president. Several provisions of the labor agreement between the Federation and the MPD established close ties between Lt. Kroll's position as president and the MPD.

382.   Lt. Kroll used his position as Federation president to bolster his influence as an MPD officer and influence the conduct of his fellow officers in a manner that was contrary to official MPD policy and the policy of official MPD decision makers. Lt. Kroll sought to persuade MPD officers to follow his policy and directives instead of rank-and-file officers and the command structure of the MPD.

383.   During his tenure as Federation president, while an MPD officer, Lt. Kroll issued many directives and policy statements regarding MPD officer conduct. Lt. Kroll also had discussions with relevant policymakers and commanders that influenced police operations and conduct.

384.   During previous incidents involving allegations of excessive force used by MPD officers, Lt. Kroll suggested that the focus should be on the victim's "violent" criminal history, instead of culpability of the officers. Lt. Kroll also referred to Black Lives Matter as a "terrorist organization."[21]

385.   On June 1, 2020, Lt. Kroll issued a letter telling other officers that he had been "closely monitoring what is occurring" with respect to the protests and the MPD's response. Lt. Kroll argued that officers "lacked support from the top" and called protesters

---

[21] Libor Jany, *Amid attention and controversy, Minneapolis police union head has no regrets*, STARTRIBUNE, Nov. 3, 2019, https://www.startribune.com/amid-attention-and-controversy-minneapolis-police-union-head-has-no-regrets/564290012/.

a "terrorist movement that […] was a long time build up which dates back years." Lt. Kroll made a criticism that the "ability for our officers to use gas munitions and less lethal munitions to defend themselves" was delayed at the start of the protests. Lt. Kroll argued that officers' ability to use such measures earlier would have ended the protests. Lt. Kroll also referred to operational discussions and communications that he had been a part of before the letter was issued. The letter closed with Lt. Kroll telling MPD officers that "your board is working hard on your behalf. We see the heroic work being done. We acknowledge and commend you for it." The statements in the letter indicate that Lt. Kroll had discussions and influence with the City of Minneapolis regarding the MPD's tactics and operations during the George Floyd protests. Lt. Kroll's encouragement of crowd-control weaponry to intimidate civilian adversaries is consistent with the operations of officers that deprived Mr. Stallings of his constitutionally-protected rights.

386.   Lt. Kroll's statements and policies encouraged officers to use force and violence against civilians protesting against police brutality and racism. Lt. Kroll used his status as an officer and influence as Federation president to provide cover and support for officers who acted contrary to official MPD policy and used excessive force as a means to intimidate protesters.

## CAUSES OF ACTION

### Count 1 – 42 U.S.C. § 1983 – Fourth Amendment Violations
### Involving Unlawful Seizure and Excessive Force
***Stallings v. Bittell, Osbeck, Cushenbery, Stetson, Dauble, Sundberg, Severance, Lokke, Stenerson, and John Does 1-5***

387.    Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

388.    The defendants acted under color of state law while performing the acts described herein.

389.    The defendants deprived Mr. Stallings' Fourth and Fourteenth Amendment rights through the actions described herein.

390.    Sgt. Severance and Sgt. Bittell ordered officers to use excessive force against civilians that included Mr. Stallings.

391.    Officer Osbeck and Sgt. Bittell specifically directed officers to use force when they encountered Mr. Stallings.

392.    Officers Cushenbery and Stetson fired 40mm rounds at Mr. Stallings in violation of his constitutional rights.

393.    Officer Dauble pointed a 40mm launcher and attempted to shoot at Mr. Stallings in violation of his constitutional rights.

394.    During the arrest of Mr. Stallings, Sgt. Bittell and Officer Stetson used improper force against Mr. Stallings in violation of his constitutional rights.

395. Sgt. Lokke, Sgt. Stenerson, Officer Sundberg, and John Does 1-5 observed improper force and failed to intervene, permitting the violation of Mr. Stallings' constitutional rights.

396. The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

397. The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

398. The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

399. As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

400. The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

401. Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count 2 – 42 U.S.C. § 1983 – First Amendment Violations**
**of Free Speech and Assembly**
***Stallings v. Bittell, Osbeck, Cushenbery, Stetson, Dauble, Severance, and Mercil***

402. Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

403. The defendants, under color of state law, retaliated against Mr. Stallings for engaging in constitutionally-protected activity.

404.    The defendants acted under color of state law while performing the acts described herein.

405.    The defendants deprived Mr. Stallings' First and Fourteenth Amendment rights through the actions described herein.

406.    Sgt. Bittell and Officers Osbeck, Cushenbery, Stetson, and Dauble engaged in a pattern of force against civilians with the purpose of intimidating and punishing them for exercising their First Amendment rights.

407.    Sgt. Severance directed officers to use force against civilians on Lake St. to punish and intimidate them for exercising their First Amendment rights. Officers acted pursuant to Sgt. Severance's orders when they used force against Mr. Stallings to intimidate and punish him for exercising his First Amendment rights.

408.    Lt. Mercil encouraged subordinate officers to target and use force against journalists and civilians exercising their First Amendment rights. Acting pursuant to Lt. Mercil's encouragement, Officer Osbeck directed officers to use force against Mr. Stallings to intimidate and punish Mr. Stallings for his efforts to protest against police brutality and racism.

409.    The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

410.    When officers used force toward Mr. Stallings, Mr. Stallings was engaged in activity protected by the First Amendment's guarantees of freedom of speech and assembly.

411.   The defendants' conduct chilled citizens from continuing to engage in constitutionally-protected activities.

412.   The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

413.   The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

414.   As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

415.   The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

416.   Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 3 – 42 U.S.C. § 1983 – Fourteenth Amendment Violations of Due Process
*Stallings v. Bittell, Osbeck, Cushenbery, Stetson, Dauble, Sundberg, Severance, Lokke, Stenerson, Jensen, Heyer, Mercil, and Folkens*

417.   Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

418.   The defendants acted under color of state law while performing the acts described herein.

419.   The defendants deprived Mr. Stallings of his Fourteenth Amendment Due Process rights through the actions described herein.

420.    Commander Folkens, Lt. Mercil, Sgt. Severance, Sgt. Bittell, and Officers Osbeck, Cushenbery, Stetson, and Dauble engaged in conduct that shocked the conscience when they engaged in an operation to hunt and use improper force toward civilians that included Mr. Stallings. Officers engaged in operations that were detrimental to legitimate law enforcement purposes and created safety risks to civilians and officers. Officers caused numerous and severe injuries to civilians, including Mr. Stallings. The conduct was particularly shocking because it occurred in the context of protests against police brutality and racism.

421.    Sgt. Jensen, Sgt. Heyer, Sgt. Bittell, Sgt. Lokke, Sgt. Stenerson, and Officers Osbeck, Cushenbery, Stetson, Dauble, and Sundberg engaged in conduct that shocked the conscience when they participated in a recklessly-flawed investigation regarding the incident involving Mr. Stallings. Officers provided false and misleading information, omitted material facts, ignored exculpatory evidence, and failed to follow leads regarding officer misconduct and exercise of self-defense by Mr. Stallings. The flawed investigation and misleading evidence formed the foundation of criminal charges against Mr. Stallings. Officers continued to provide false and misleading testimony throughout criminal proceedings.

422.    The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

423.    The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

424.    The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

425.    As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

426.    The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

427.    Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 4 – 42 U.S.C. § 1983 – Fourteenth Amendment Violation
### of Equal Protection Clause
***Stallings v. Bittell, Osbeck, Cushenbery, Stetson, Dauble, Severance, and Mercil***

428.    Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

429.    Mr. Stallings is a Black man who protested police brutality and racism following the murder of Mr. Floyd.

430.    Officers deprived Mr. Stallings of his Equal Protection Clause rights due to the actions described herein.

431.    Lt. Mercil encouraged Officer Osbeck to target Black civilians due to racial animus.

432.    Officers falsely accused Mr. Stallings, and other Black civilians, of engaging in looting and rioting despite the absence of evidence supporting those allegations.

433.    Sgt. Severance, Sgt. Bittell, and Officers Osbeck, Cushenbery, Stetson, and Dauble engaged in an operation on Lake St. that targeted and used force primarily against Black civilians, as well as civilians expressing solidarity for Black civilians' rights.

434.    Mr. Stallings was targeted and shot by officers due to racial animus and discrimination.

435.    The defendants acted under color of state law while performing the acts described herein.

436.    The defendants' actions violated constitutional rights that were clearly established on May 30, 2020.

437.    The defendants deprived Mr. Stallings of his constitutional rights due to his status as a Black man.

438.    The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

439.    The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

440.    As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

441.    The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

442.    Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**Count 5 – 42 U.S.C. § 1983 – Conspiracy to Interfere with the
Assertion of Constitutional Rights**
*Stallings v. Bittell, Osbeck, Cushenbery, Stetson, Dauble, Sundberg, Severance, Lokke,
Stenerson, Jensen, Heyer, Mercil, Folkens, Kroll, and John Does 1-5*

443.   Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

444.   The defendants conspired to deprive Mr. Stallings of constitutional rights. The violations of constitutional rights have been described herein.

445.   Members of the conspiracy engaged in acts that did, in fact, deprive Mr. Stallings of constitutional rights.

446.   Members of the conspiracy aided the violation of constitutional rights by authorizing, condoning, and encouraging the violations. Members failed to report officer misconduct and shielded officers from accountability or discipline due to the violation of constitutional rights. Members provided false and misleading reports to facilitate the violation of constitutional rights.

447.   Members engaged in conduct suggesting agreement, including violation of MPD policies, consistent conduct and statements among multiple officers at multiple locations, and assent to other officers' violations of constitutional rights.

448.   The deprivation of constitutional rights permitted by the conspiracy caused injury and harm to Mr. Stallings.

449.   The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

450.   The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

451.   As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

452.   The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

453.   Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 6 – 42 U.S.C. § 1983 – Supervisory Liability
*Stallings v. Bittell, Severance, Lokke, Jensen, Heyer, Mercil, and Folkens*

454.   Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

455.   At all material times, the defendants had supervisory responsibilities over officers who deprived Mr. Stallings of his constitutional rights.

456.   The defendants had actual knowledge that officers were violating constitutional rights of civilians, including those of Mr. Stallings.

457.   The defendants also had actual knowledge that officers were failing to accurately report on conduct that deprived persons, including Mr. Stallings, of their constitutional rights.

458.   The defendants acted under color of state law and with deliberate indifference to, authorized, or acquiesced in the violations of Mr. Stallings' constitutional rights by other officers.

459.   The defendants acted with evil intent or reckless indifference to Mr. Stallings' rights.

460.   The defendants subjected Mr. Stallings to these deprivations of his rights in such a manner as to render them liable for punitive damages.

461.   As direct and proximate result of the acts of the defendants, Mr. Stallings suffered injuries and other harms that entitle him to damages.

462.   The manner in which the defendants deprived Mr. Stallings of his rights supports an award of punitive damages, which are necessary to deter further improper conduct.

463.   Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count 7 – *Monell* Civil Rights Violation
### *Stallings v. City of Minneapolis*

464.   Mr. Stallings realleges all allegations of this Complaint as if fully stated herein.

465.   Before officers encountered Mr. Stallings, the City of Minneapolis and the MPD had continuing, widespread, and persistent customs of unconstitutional misconduct by officers.

466.   The customs have been described herein. They include excessive use of force with crowd-control and less-lethal weaponry, excessive use of force during arrests, improper targeting and use of force against Black persons, and failure to report, investigate, and punish constitutional violations by officers.

467.   The City of Minneapolis had notice that these customs existed through widely-reported patterns and specific violations by its officers.

468.   Supervisors and officers participated in and witnessed numerous examples of these customs before and surrounding the incident with Mr. Stallings.

469.   The City of Minneapolis engaged in deliberate indifference to or tacit authorization of such conduct by officers after having notice of misconduct.

470.   The City of Minneapolis failed to supervise or train officers adequately to prevent the constitutional violations described herein.

471.   Policymaking officials of the City of Minneapolis undertook actions with deliberate indifference that caused violations of Mr. Stallings' constitutional rights.

472.   Mr. Stallings was injured by officers' actions pursuant to these improper customs. The MPD's failure to adequately train and supervise officers contributed to Mr. Stallings' injuries.

473.   As direct and proximate result of the acts of the defendant, Mr. Stallings suffered injuries and other harms that entitle him to damages.

474.   Mr. Stallings is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jaleel Stallings prays for judgment as follows:

1.      That the Court find that the defendants committed acts and omissions violating the First, Fourth, and Fourteenth Amendments to the United States Constitution permitting a cause of action under 42 U.S.C. § 1983;

2.      As to Counts 1-6, a money judgment against the defendants for compensatory and punitive damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count 7, a money judgment against the defendant for compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.      For an order mandating changes in policies and procedures of the MPD to prevent further violations of constitutionally-protected rights as stated herein;

5.      For such other and further relief as this Court may deem just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date: October 28, 2021

**LAW OFFICE OF ERIC A. RICE, LLC**

*s/Eric Rice*
Eric A. Rice (MN #0388861)
1 W. Water St., Ste. 275
St. Paul, MN 55107
P: (651) 998-9660
F: (651) 344-0763
eric@ricedefense.com

Attorney for Plaintiff Jaleel Stallings